George Hofmann (10005)
Benjamin J. Kotter (9592)
Adam H. Reiser (13339)
**Parsons Kinghorn Harris**
A Professional Corporation
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
Telephone: (801) 363-4300
Facsimile: (801) 363-4378
Email: gbh@pkhlawyers.com
         bjk@pkhlawyers.com
         ahr@pkhlawyers.com

*Proposed Attorneys for Debtor-in-Possession DGS Store Fixtures, Inc.*

---

### IN THE UNITED STATES BANKRUPTCY COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re | Bankruptcy Case No. 14-31080 |
| DGS STORE FIXTURES, INC., | Chapter 11 |
| Debtor. | Honorable Joel T. Marker |

---

### MOTION FOR ORDER APPROVING SALE OF SURPLUS EQUIPMENT
### OR ALTERNATIVELY, MOTION TO AUTHORIZE THE ASSUMPTION
### OF EQUIPMENT PURCHASE AGREEMENT

---

Pursuant to Bankruptcy Code §§ 363 and 365, and Bankruptcy Rules 2002, 6004

and 6006, DGS Store Fixtures, Inc. (the "Debtor") through its undersigned counsel,

hereby files its *Motion for Order Approving Sale of Surplus Equipment or Alternatively,*

*Motion to Authorize the Assumption of Equipment Purchase Agreement* (the "Motion").

In support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The Debtor filed a voluntary chapter 11 petition on October 20, 2014.  The Debtor continues to operate its business and manage its property as a debtor in possession pursuant to Bankruptcy Code §§ 1107 and 1108.

5.      No examiner or trustee has been appointed in this case.

## GENERAL BACKGROUND

6.      The Debtor is a manufacturer of custom retail store fixtures which it sells to large national retail chains including supermarkets, drug stores, department stores and various specialty retailers.  Customers retain the Debtor to manufacture custom fixtures specific to their individual needs and designs.  The fixtures are primarily made of wood, but also include metal, acrylic, lighting and graphics.

7.      The Debtor currently operates out of a 102,000 square foot plant in Payson, Utah (the "Payson Facility").  However, the Debtor anticipates ceasing all in-house production in its Payson Facility on October 31, 2014 and will service its remaining customers through a network of local vendors.

8.      Because the Debtor's ongoing business model does not contemplate continued manufacturing after October 31, 2014, on October 10, 2014, ten days prior to its unanticipated bankruptcy filing, the Debtor entered into an Equipment Purchase

Agreement (the "Agreement") with JSI Store Fixtures, Inc. ("JSI") whereby JSI agreed to purchase from the Debtor certain "Equipment" as defined in the Agreement attached hereto as Exhibit A and incorporated herein by reference.

9.      Pursuant to the terms of the Agreement, JSI will purchase much of the Debtor's equipment located in the Payson Facility.  Furthermore, the Debtor is informed that JSI and the landlord for the Payson Facility are negotiating lease terms whereby JSI will operate out of a portion of the Payson Facility with the Equipment and anticipates hiring some of the Debtor's former employees.

10.      As far as the Debtor is aware, JSI and its principals have no connection – other than pursuant to the Agreement – with the Debtor or the Debtor's principals.  The Agreement was entered into between the Debtor and JSI as an arms' length business transaction upon commercially reasonable business terms.

11.      Prior to entering into the Agreement, the Debtor received two other offers to purchase the Equipment but selected JSI in its business judgment as the highest and best offer for the Equipment.

12.      At the time the Agreement was negotiated and executed, the Debtor was attempting an orderly wind down of its operations and transition to its new business model and it was neither contemplated nor anticipated that the Debtor would be required to file bankruptcy prior to closing the Equipment sale pursuant to the Agreement.

13.      Pursuant to the terms of the Agreement, JSI agreed to purchase the Equipment for $500,000.  JSI made an initial deposit of $50,000 in connection with the execution of the Agreement on October 10, 2014, which the Debtor is holding.  The

remaining $450,000 balance of the purchase price will be paid at closing.  *See*

Agreement, ¶3.

14.     The Agreement calls for the closing to "take place on October 31, 2014 or

on a date mutually agreed to by the [JSI] and [Debtor] (the "Closing Date")."  *See*

Agreement ¶2(c).  Because of the Debtor's unanticipated bankruptcy filing, although JSI

has not waived the Closing Date deadline, it has nonetheless expressed its willingness

to honor the terms of the Agreement if closing occurs before November 27, 2014.

15.     All of the Equipment to be sold pursuant to the Agreement is encumbered

by a properly perfected lien of Santander Bank, N.A. ("Santander Bank") and all

proceeds from the sale of the Equipment shall be the Cash Collateral (as defined in 11

U.S.C. §363(a)) of Santander Bank.

## RELIEF REQUESTED

**I.     Sale of Equipment Pursuant to §363**

16.     Bankruptcy Code § 363 provides that the Debtor, "after notice and a

hearing, may use, sell or lease, other than in the ordinary course of business, property

of the estate."  Bankruptcy Code § 363(b).  To approve the use, sale or lease of

property outside of the ordinary course of business, the Debtor must show four

requirements:  "(1) that a sound business reason exists for the sale; (2) there has been

adequate and reasonable notice to interested parties, including full disclosure of the sale

terms and the Debtor's relationship with the buyer; (3) that the sale price is fair and

reasonable; and (4) that the proposed buyer is proceeding in good faith."  In re Medical

Software Solutions, 286 B.R. 431 (Bankr. D. Utah 2002); accord Committee of Equity

Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)

(identifying the "sound business purpose" test); In re Abbotts Dairies of Penn., Inc., 788

F.2d 143, 145-47 (3d Cir. 1986) (implicitly adopting the articulated business justification

test of Lionel, and adding the "good faith" requirement).

17.    In general, bankruptcy courts often defer to a debtor's business judgment

regarding the sale of estate assets, unless such decision is arbitrary and capricious.

See In re Curlew Valley Assocs., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981).  Courts

generally will not second-guess a debtor's business decisions when those decisions

involve "a business judgment made in good faith, upon a reasonable basis, and within

the scope of his authority under the Code." Curlew Valley, 14 B.R., at 513-14 (footnotes

omitted).

18.    The Debtor has sound business reasons for the proposed sale.  After

October 31, 2014, the Debtor will cease operating out of the Payson Facility and the

Debtor's ongoing business model – to service its remaining customers through a

network of local vendors – means that the Debtor will have no further use for the

Equipment.

19.    As to the second factor, the Debtor submits that this Motion provides

ample notice to parties in interest of the proposed sale.  Among other things, the Debtor

proposes to provide notice and sufficient time for parties in interest to submit objections.

Furthermore, the Debtor has been looking to sell its Equipment for several months and

has been actively searching for the most beneficial sale of the Equipment.

20.    Based on an competing offers for the Equipment received by the Debtor

prior to its bankruptcy filing, and its own significant knowledge and experience with the

Equipment, the Debtor believes the proposed sale price represents fair value for the

Equipment. In addition, the sale of the Equipment will conserve the estate's resources because the estate will not be required to pay for the storage or maintenance of the Equipment.

21.     Finally, the Debtor believes and submits that JSI has proceeded in good faith with respect to sale of the Equipment. In the context of 11 U.S.C. §363(m) a "good faith" purchaser is "one that buys in good faith, and for value." <u>Tompkins v. Frey (In re Bel Air Assocs., Ltd.)</u>, 706 F.2d 301, 304 (10th Cir. 1983). Actions that destroy a purchaser's good father include "fraud, collusion between purchaser and other bidders or trustee, or an attempt to take grossly unfair advantage of other bidders." <u>Id.</u> At 305 n. 11; <u>see</u> <u>also</u>, <u>In re Lotspeich</u>, 328 B.R. 209 (10th Cir. BAP 2005).

22.     Here, the Debtor has solicited independent bids for the Equipment. Additionally, the terms of the Agreement were independently negotiated by the Debtor and JSI, and in the Debtor's business judgment, the purchase price for the Equipment set forth in the Agreement represents a fair and reasonable value for the Equipment. Finally, the material terms of the Equipment's sale are being fully disclosed to the Court and parties in interest. Accordingly, the Debtor submits that the proposed sale of the Equipment to JSI is an arms-length transaction made to a good faith buyer.

23.     Because the proceeds from the sale of the Equipment constitute Santander Bank's Cash Collateral, the Debtor is also requesting authority to pay all the sale proceeds directly to Santander Bank.

**II.    Assumption of the Equipment Purchase Agreement Pursuant to §365**

24.     In the alternative, the Debtor proposes to assume the Agreement pursuant to 11 U.S.C. §365(a) of the Bankruptcy Code which provides that a debtor, "subject to

the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor.  It provides:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A)   cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B)   compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)   provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

25.     The decision to assume or reject an executory contract or unexpired lease is a matter within the "business judgment" of the debtor.  Group of Institutional Investors v. Chicago, Milwaukee, St. Paul and Pacific Railroad Co., 318 U.S. 523, 549-550 (1943).  The business judgment standard mandates that a court approve a debtor's business decision unless the decision is the product of bad faith, whim or caprice. Lubrizol Enters. v. Richmond Metal Finishes, 756 F.2d 1043, 1047 (4th Cir. 1985). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"  Official Comm. of Subordinated Bondholders v.

Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).  Therefore, the business

judgment standard is satisfied when the debtor determines that acceptance or rejection

will benefit the estate.  In re TS Indus., Inc., 117 B.R. 682, 685 (Bankr. D. Utah 1990).

26.    It is the Debtor's business judgment that the assumption of the Agreement

is in the best interests of the estate and its creditors.  Significantly, the Debtor is not

continuing its manufacturing operation beyond October 31, 2014 and has no further use

of the Equipment.

27.    The Debtor believes that its reorganization around a more nimble

business model that will service its remaining customers through outsourcing to local

vendors is in the best interests of creditors and will maximize returns to all creditors.

28.    Courts give the phrase "adequate assurance of future performance" a

"practical, pragmatic construction."  EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g

Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992), aff'd, 993

F.2d 300 (2d Cir. 1993) (presence of adequate assurance should be "determined under

the facts of each particular case").  Adequate assurance does not require a debtor to

provide a guarantee of future performance; assurance is deemed adequate as long as

performance is more probable than not.  See Cinicola v. Scharffenberger, 248 F.3d 110,

120 n. 10 (3d Cir. 2001) ("Although no single solution will satisfy every case, the

required assurance will fall considerably short of an absolute guarantee of

performance." (quotations and citations omitted)).

29.    Here, the Debtor's has not defaulted on its obligations owing under the

Agreement and its remaining obligations only require it to effectuate the transfer of the

Equipment pursuant to the Agreement for which the Debtor will receive an additional

$450,000 payment.  This coupled with the Debtor's change in its business practice

offers adequate assurance to JSI that the Debtor will perform as required under the

Agreement.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests entry of an order:

A.       Granting this Motion;

B.       Authorizing the sale of the Equipment on the terms and conditions of the

Agreement pursuant to 11 U.S.C. §§ 105 and 365;

C.       Finding he JSI is a "good faith purchaser" including for purposes of 11

U.S.C. § 363(m);

D.       Authorizing the Debtor to pay to Santander Bank the Equipment sale

proceeds;

E.       In the alternative, approving the Debtor's assumption of the Agreement

pursuant to 11 U.S.C. §365; and

F.       For such other and further relief as is just and proper under these

circumstances.

DATED this 31st day of October, 2014.

PARSONS KINGHORN HARRIS
*A Professional Corporation*

*/s/ Benjamin J. Kotter*
George Hofmann
Benjamin J. Kotter
*Proposed Attorneys for the Debtor DGS Store Fixtures, Inc.*

# Exhibit A

## EQUIPMENT PURCHASE AGREEMENT

This Equipment Purchase Agreement (the "*Agreement*") entered into as of October 10, 2014, by and among (i) **JSI STORE FIXTURES INCORPORATED**, a Delaware corporation (the "*Buyer*"), (ii) **DGS STORE FIXTURES, INC.**, a Delaware corporation (the "*Seller*"), and (iii) **DGS RETAIL HOLDINGS, INC.**, a Delaware corporation, which owns all of the issued and outstanding stock of the Seller (the "*Sole Owner*"). The Buyer, the Seller and the Sole Owner are referred to collectively herein as the "*Parties*" and singularly as a "*Party*".

## W I T N E S S E T H :

WHEREAS, the Seller owns the equipment set forth on Schedule A (collectively, the "*Equipment*"); and

WHEREAS, the Buyer desires to purchase from Seller the Equipment excluding the assets listed on Schedule B (the "Excluded Assets") (and assume none of the liabilities) of the Seller, and the Seller desires to sell the Equipment to the Buyer, in each case on the terms, and subject to the conditions, set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the agreements and mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties hereby agree as follows.

1. *Definitions.* In addition to the terms given definition elsewhere herein, certain terms shall have meanings set forth on Annex I.

2. *Basic Transaction.*

(a) *Purchase and Sale of Equipment.* On and subject to the terms and conditions of this Agreement, the Buyer hereby purchases from the Seller, and the Seller hereby sells, transfers, assigns, conveys, and delivers to the Buyer, all of the Seller's right, title and interest in and to the Equipment, free and clear of any and all Security Interests or lease obligations, in consideration of the Purchase Price. The Parties specifically acknowledge and agree that the Seller shall retain the Excluded Assets subsequent to the Closing and that no liabilities will be assumed by the Buyer.

(b) *No Assumption of Liabilities.* The Buyer will not assume any liabilities of the Seller whatsoever, whether relating to the Equipment or the Excluded Assets.

(c) *The Closing.* If the conditions set forth in Section 2(d) have been satisfied, then the closing of the transactions contemplated hereby (the "*Closing*") shall take place on October 31, 2014 or on a date mutually agreed to by the Buyer and Seller (the "*Closing Date*").

(d) *Conditions to Closing*: The obligation of the Buyer to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions as of the Closing:  (i) Seller has delivered a letter or letters executed by any and all banks and/or other secured parties with a Security Interest in the Equipment which authorizes (A) the release of all Security Interests in the Equipment on the Closing Date, and (B) the filing of an amendment or termination statement to any applicable financing statement by the Buyer's authorized representatives, and (ii) Seller has delivered substantially the same Equipment as described on Schedule A.

(e) *Payments in Cash.* All cash payments made pursuant to this Agreement shall be made in United States dollars, by wire transfer to such accounts as the Buyer or the Seller, as the case may be, shall designate in writing, or by certified or cashier's check.

(f) *Transfer Taxes.* The Buyer shall pay any applicable sales, transfer, use, purchase or similar Taxes ("*Transfer Taxes*") resulting from the transactions contemplated hereby. The Parties hereto shall also cooperate in providing the information required by any returns or other documentation relating to Transfer Taxes.

(g) *Other Deliveries.* At the Closing, the Seller and Buyer will execute and deliver to the other is a bill of sale, in a form to be mutually agreed by Buyer and Seller.

3. *Purchase Price and Closing Payment.* The aggregate purchase price for the Equipment shall be equal to:

(a) a $50,000 deposit (the "Deposit"), payable by the Buyer to the Seller on the date hereof; provided, that, if (i) the Seller for any reason cannot transfer the Equipment free and clear of any Security Interests or (ii) the Equipment is materially different

from the Equipment described on Schedule A, then the Seller shall promptly return the Deposit to the Buyer in full in the time and manner identified by the Buyer at such time; plus

(b) the sum of $450,000 (the *"Cash Closing Payment"*, collectively, the *"Purchase Price"*).

(c) The Purchase Price shall be paid as follows: (i) as of the date hereof, the Buyer shall pay to the Seller the Deposit, and (ii) at the Closing, Buyer shall pay to the Seller the Cash Closing Payment. **For the avoidance of doubt, the Deposit is only refundable to Buyer in the case of the circumstances described in clauses (i) and (ii) of Section 3(a) hereof.**

4. *Representations and Warranties of the Seller and the Sole Owner.* The Seller and the Sole Owner jointly and severally represent and warrant to the Buyer that the statements contained in this §4 are correct and complete as of the date of this Agreement.

(a) *Organization of the Seller.* Each of the Seller and the Sole Owner is a corporation duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation. Each of the Seller and the Sole Owner has all requisite power and authority, and all licenses, Permits, and authorizations necessary, to own, operate and lease the Equipment.

(b) *Authorization of Transactions.* Each of the Seller and the Sole Owner has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of the Seller and the Sole Owner, enforceable against the Seller and the Sole Owner in accordance with its terms and conditions.

(c) *Title to Assets.* The Seller has good and marketable title to the Equipment, free and clear of all Security Interests or restriction on transfer.

5. *Representations and Warranties of the Buyer.* The Buyer represents and warrants to the Seller that the statements contained in this §5 are correct and complete as of the date of this Agreement.

(a) *Organization of the Buyer.* The Buyer is a limited liability company validly existing under the laws of the State of Delaware.

(b) *Authorization of Transactions.* The Buyer has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of the Buyer, enforceable in accordance with its terms and conditions.

6. *Post-Closing Covenants.* The Parties agree as follows with respect to the period following the Closing.

(a) *General.* If at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under §7 below).

7. *Remedies for Breaches of this Agreement; Indemnification.*

(a) *Obligations of the Seller and the Sole Owner to Indemnify.* The Seller and the Sole Owner shall, jointly and severally, indemnify, defend and hold harmless the Buyer and its assigns from and against any Adverse Consequences suffered, sustained, incurred or required to be paid by the Buyer or its assigns, as the case may be, based upon, arising out of or otherwise with respect to (i) any failure to perform or comply with any covenant or agreement of the Seller and/or the Sole Owner contained herein or in any document or other paper delivered pursuant hereto, (ii) any Excluded Liability, (iii) a breach or inaccuracy of any representation or warranty of the Seller and the Sole Owner contained in §4 for which a claim was asserted prior to the expiration of the applicable survival period, and/or (iv) any facts alleged by any third party that, if true, would constitute a breach, event or occurrence of the type described in clause (iii).

The foregoing indemnities shall not be exclusive, but shall be in addition to any other rights or remedies to which the Buyer and its assigns, as the case may be, may be entitled at law or in equity.

(b) *Obligation of the Buyer to Indemnify.* The Buyer shall indemnify, defend and hold harmless the Seller, the Sole Owner and their respective assigns from and against any Adverse Consequences suffered, sustained, incurred or required to be paid by the Seller or the Sole Owner based upon, arising out of or otherwise with respect to, (x) a breach or

inaccuracy of any representation or warranty of the Buyer for which a claim was asserted prior to the expiration of the applicable survival period, or (y) any facts alleged by any third party prior to the expiration of the applicable survival period that, if true, would constitute a breach of the type described in clause (x), or (z) any failure to perform or comply with any covenant or agreement of the Buyer contained herein or in any document or other paper delivered pursuant hereto. The foregoing indemnity shall not be exclusive, but shall be in addition to any other rights or remedies to which the Seller, the Sole Owner and their respective assigns may be entitled at law or in equity.

(c) *Covered Persons.* The obligations of the Seller under §7 shall extend, upon the same terms and conditions, to each person, if any, who controls the Buyer, and each of their respective successors and assigns, and to directors, officers, managers, employees, consultants and agents of the Buyer and each of their respective assigns, and their controlling persons.

8. *Termination:* This Agreement may be terminated as follows:

(a) by mutual written consent of the Buyer and Seller;

(b) by Buyer, unilaterally, if any condition to Closing set forth in Section 2(d) is not satisfied by Seller by October 31, 2014, (or such other date as the parties may agree upon); or

(c) by the Seller, unilaterally, if any condition to Closing set forth in §2(d) is not satisfied on or before October 31, 2014, (or such other date as the Parties may agree upon), unless such failure to satisfy the Section 2(d) condition is due to the failure of Seller to perform or comply with any of the covenants or agreements to be performed or complied with by them prior to Closing or due to a breach of Seller's representation herein.

(d) For the avoidance of doubt, if the Seller has satisfied the conditions in §2(d) by October 31, 2014 (or such other date agreed by Buyer and Seller), then Seller is entitled to the Deposit in full and the Buyer will be obligated to close on October 31, 2014 (or such other date agreed by Buyer and Seller). The Buyer may only terminate this Agreement unilaterally if the Seller has failed to satisfy the conditions in §2(d) by October 31, 2014 (or such other date agreed by Buyer and Seller). If any Party terminates this Agreement pursuant to Section 8

above, all rights and obligations of the Parties hereunder shall terminate, provided that each Party shall remain liable for any willful breach of any covenant contained in this Agreement prior to such termination.

9. *Miscellaneous.*

(a) *No Third-Party Beneficiaries.* This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

(b) *Entire Agreement.* This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.

(c) *Succession and Assignment.* This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Parties; *provided, however,* that the Buyer may (i) assign any or all of its rights and interests hereunder to one or more of its Affiliates; (ii) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases the Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder); (iii) assign any or all of its rights hereunder in connection with a sale of all or substantially all of its business; and/or (iv) assign its rights hereunder to any lenders or financing sources, their agent and their successors and assigns.

(d) *Counterparts.* This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

(e) *Notices.* All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given if (and then two business days after) it is sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the intended recipient as set forth on the signature pages hereto.

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth. Any Party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail, or electronic mail), but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient.

(f) *Governing Law*. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

(g) *Severability*. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

(h) *Expenses*. Each of the Parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

(i) *Specific Performance*. The Buyer shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof, in addition to any other remedy to which the aggrieved Party may be entitled, at law or in equity.

(j) *Jury Trial Waiver*. NO PARTY TO THIS AGREEMENT OR ANY ASSIGNEE, SUCCESSOR, HEIR OR PERSONAL REPRESENTATIVE OF A PARTY SHALL SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDING, COUNTERCLAIM OR ANY OTHER LITIGATION PROCEDURE BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE OTHER AGREEMENTS OR THE DEALINGS OR THE RELATIONSHIP BETWEEN THE PARTIES. NO PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION, IN WHICH A JURY TRIAL HAS BEEN WAIVED, WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED. THE PROVISIONS OF THIS SECTION HAVE BEEN FULLY DISCUSSED BY THE PARTIES HERETO, AND THESE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS. NO PARTY HERETO HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PARTY HERETO THAT THE PROVISIONS OF THIS SECTION WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

(k) *Joint and Several Liability*. Each and every liability of the Seller and/or the Sole Owner hereunder shall be the joint and several liability of the Seller and the Sole Owner.

* * * *

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**BUYER:**

**JSI STORE FIXUTRES INCORPORATED**

By: _Ty Awalt_  President
Name:    Terry Awalt
Title:      President
Address:

**SELLER:** ,

**DGS STORE FIXTURES, INC**

By: _____
Name:  Peter Stevens
Title:    CEO
Address: 959 W. UTAH AVE PAYSON, UT.

**SOLE OWNER:**

DGS Retail, HOLDINGS, INC

By: _____
Name:  Peter Stevens
Title:    CEO
Address:

{01927545; 5; 6015-1 }          [Signature Page to Asset Purchase Agreement]

"*Adverse Consequences*" means all proceedings, charges, complaints, claims, judgments, damages, penalties, fines, costs, amounts paid in settlement, Liabilities, Taxes, liens, expenses, and fees, including court costs and reasonable attorneys' fees and expenses, and specifically including any such expenses and fees incurred in connection with establishing the existence of Adverse Consequences or the Liability of a Party with respect thereto.

"*Affiliate*" means a Person controlling, controlled by or under common control with another Person.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Constitutive Documents*" of an entity means the charter, bylaws, certificate of formation, operating agreement or other similar organizational, constitutive or governing documents of such entity.

"*Excluded Liabilities*" means each and every liability of the Seller.

"*GAAP*" means United States generally accepted accounting principles as in effect from time to time.

"*Liability*" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any Tax Liability.

"*Person*" means an individual, a partnership, a limited partnership, a corporation, an association, a joint stock company, a trust, a limited liability company, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency, or political subdivision thereof).

"*Security Interest*" means any mortgage, pledge, lien, encumbrance, charge, or other security interest of any kind, including any lease interest.

"*Tax*" and "*Taxes*" mean any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Sec. 59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"*Tax Liability*" means any Liability for Taxes.

**Schedule A**

**Equipment**

### Schedule "A"
### Consignor's Assets

| Manufacturer | Model | Serial # | Description |
|---|---|---|---|
| Holzma | HPP=510/38/38 | 0-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 | 2004 CNC Front Load Panel Saw |
| American | | | Scissor Lift |
| HMT | Therma Web | B62/500 | 1993 Laminate Line |
| American | | | Scissor Lift & Lay-up Table |
| Yale | GLP050ZGE85 | A875B10486X | Forklift: 3250 Lb. Cap, LP Gas, 3-Stage Mast, Side Shift, 6987 Hours |
| | | | Pallet Rack (4-Sections) |
| Vestal | | | Dump Hopper |
| Mac | | | Dust Collection System: 100 Hp, Fan, LMC Rotary Air Lock, Air Pulse |
| Marathon | Ramjet | | Compactar |
| | | | Cyslone Dust Collector w/ Air Lock |
| Holzma | HPL33/38/16 | 0-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 | 1999 CNC Rear Load Panel Saw |
| American | | | Scissor Lift |
| Quiet Cooler | | | Swamp Fan |
| Vestal | | | Dump Hopper |
| Griggio | TPL-2000 | 2887 | 1986 Shaper w/ 4-Roll Feeder |
| | | | Cantilever Rack (2-Sections) |
| Her Saf | | | Panel Router |
| Delta | 12-14 | RT-40 | Table Saw w/ Powermatic 3-Roll Feeder |
| Her Saf | | | Panel Router |
| Wadkin Bursgreen | | 12AGS651023 | Table Saw w/ 3-Roll Feeder |
| Altendorf | F-45-2800 | 96-04-126 | 1996 Sliding Table Saw: Short Stop Brake |
| Morbidelli | Globo | 5D15 | 1983 32mm Borer |
| | | | Router Tables (Qty 2) |
| Powermatic | | | 36" Pin Router (R8 type looking) |
| Crouch | 71-60 | | Edge Sander: Oscillating |

COPYRIGHT © INDUSTRIAL RECOVERY SERVICE, INC 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014. All
Rights Reserved.
Proposal

| | | | |
|---|---|---|---|
| | | | Router Table |
| Vitap | 35T-2 Alpha | 210736E | 2013  Vertical/Horizontal Borer |
| | | | Dump Hopper: 1/2 Cubic Yard |
| Sandingmaster | 3300-1350 WWS | S91-7563 | Wide Belt Sander: Floating Bed, 53" Cap, (3) Head, Contact, Contact, Platen |
| Ritter | R-130 | 1411 | Horizontal Borer |
| Apex | 0SS-3-85 | 0S-0107-86 | Spindle Sander |
| | | | Cantilever Rack |
| Toyota | | | Electric Forklift: Ferra Battery Charger |
| Weinig | Hydromat 23 | 83361 | Moulder: 7-Spindle w/ Universal, B,R,L,R,T,T,B,U, Jointed, Hydraulic Feed, Outboard Bearing |
| Griggio | PF-400 | 1848 | 1985  12" Jointer, 8000 rpm |
| Northtech | MRS-350A | 0659032 | 2006  Gang Rip Saw: 75 Hp, (1) Laser Guide Light |
| Delta | | | Radial Arm Saw |
| Oliver | 299C | 207260 | 24" Planer: Itch Helical Head |
| Weinig | R-934 | 934-858 | 1997  Profile Grinder |
| Weinig | 970070 | 83303 | 1998  Optical Comparator |
| | | | Jointing Preset Stand |
| | | | Moulder Heads & Profile Knives: (34) Heads |
| Delta | | | Benchtop Grinder |
| Justrite | | | Flammable Cabinet |
| | | | Dump Hopper |
| Lift Rite | | | Pallet Jack |
| Dewalt | DW718 | | Sliding Arm Miter Saw |
| Delta | 28-205 | 86E08594 | 14" Bandsaw |
| Central | | | 8" Benchtop Drill Press |
| | | | Folding Plastic Saw Horses (Qty 34) |
| Shop Fox | W-1687 | M088887 | 2011  3 Hp Dust Collector |
| Omga | RN-450 FM "US" | 255886 | Radial Arm Saw w/ Tiger Stop |
| | Rover B 7.50 | 14714 | 2007  CNC Maching Center: (2) Tool Changer, (1) Router, Grooving |

COPYRIGHT © INDUSTRIAL RECOVERY SERVICE, INC  2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014.  All Rights Reserved.
Proposal

| Biesse | | | Saw, Vertical & Horizontal Drill Spindles |
|---|---|---|---|
| Weeke | Optimat BHC-550 | 0-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 | 2003 Flat Table CNC Router: (8) Ride Along Tool Changer, (1) Router, (1) Grooving Saw, Vertical & Horizontal Drill Spindles, (2) Becker Vacuum Pumps |
| | | | Dump Hopper (Qty 2) |
| Busellato | Super Master H-150 | 3794 | 1994 CNC Maching Center: Becker Vacuum Pump |
| Homag | Optimat KAL 310/3/A3 | 0-200-03-795 | 2004 Edgebander: Granular Glue, End Trim, Top & Bottom Trim, Top & Bottom Buffing |
| Biesse | Stream 81.9.5 | 30565 | 2003 Edgebander w/ Thomos Return Conveyor: Premill, Granular Glue, End Trim, Top & Bottom Trim, Top & Bottom Fine Trim, Corner Rounding, Profile Scraping, Top & Bottom Scraping, Top & Bottom Buffing, Top & Bottom Heat Glossers |
| Thomas | | 2040197 | Return Conveyor |
| | | | Pallet HJAcka (Qty 6) |
| Biesse | Polymac | 56996 | 2005 Single Contour Edgebander |
| Multi-Cam | MG Series | MG20441914 | CNC Router: 5' x 10' Table |
| | | | Dump Hopper |
| Mar Bel | LS-1 | 5365 | 1986 Slitter |
| Delta | 70-20 | R9328 | 17" Drill Press |
| Delta | | | Unisaw |
| Delta | | | Benchtop Grinder |
| Delta | | | Sidekick Miter Saw |
| Delta | 70-200 | R-9328 | 17" Drill Press |
| Crown | | | Pallet Jack |
| Kreg | DK | DK 027068 | Pocket Borer |
| Ridgid | | | Miter Saw |
| Knaack | | | Job Boxes w/ Hand Tools in boxes |
| Her Saf | | | Vacuum Jigs |
| Hyster | E50XL-27 | C108V06845J | Electric Forklift: 4500 Lb. Cap, 3-Stage Mast, Side Shift |
| Hyster | E50XL-27 | C108YO6846J | Electric Forklift: 3-Stage mast, Side Shift |
| | | | Rolling Safety Ladder |
| Fox | 60 | 944427 | Baler |
| | | | Pallet Rack (3-Sections) |

COPYRIGHT © INDUSTRIAL RECOVERY SERVICE, INC 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014.   All Rights Reserved.
Proposal

| | | | |
|---|---|---|---|
| Eagle | 1932 | | Flammable Cabinet: 30-Gallon |
| | | | Spray Booth |
| Seco | | | Dust Collector |
| Shannon | | | Tabletop Post Former |
| Wesco | | | Pallet Jack |
| Almex | TL6-59-114 | 2001-08-13702 | Membrane Vacuum Press: Shuttle w/ (2) Tables, 51" x 106" |
| | | | Pallet Rack (56-Sections) |
| | | | Pallet Jacks (Qty 2) |
| | | | Dump Hopper: 1/2 Cubic Yard |
| Central | | | 8" Drill Press |
| | | | Cantilever Rack |
| Roland Soljet Por III | XC-540 | ZV31635 | Printer |
| Roland Soljet Por III | XC-540 | ZV90582 | Printer |
| Roland Soljet Por III | XC-540 | ZW13754 | Printer |
| Roland | Camm-1 Pro | | Printer |
| GBC | Artic Titan | RG02697G | Laminator |
| GBC | Artic Titan | OEG3625 | Laminator |
| | | | Pallet Rack (4-Sections: 8' |
| Makita | | | Miter Saw Sliding Arm |
| Bewo | | | Cutoff Saw |
| CTD | | 3444 | Cutoff Saw |
| | | | Pallet Jacks (Qty 2) |
| Orion | M67/17i5 | 2007-0717801 | Stretch Wrapper |
| | | | Pallet Jacks (Qty 7) |
| | | | Banding Carts (Qty 4) w/ Tools |
| Salter | Breakmell | | Digital Scale |
| | | | Banding Carts |

COPYRIGHT © INDUSTRIAL RECOVERY SERVICE, INC  2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014.  All Rights Reserved.
Proposal

| | | | |
|---|---|---|---|
| Safety Speed Cut | H-5 | | Vertical Panel Saw |
| Kufo/Seco | | | Dust Collector |
| | | | Pallet Rack (2-Sections) |
| Sullair | 12BS-50HACAC | 003-89298 | Air Compressor: 50 Hp |
| Sullair | 3709/A | 200710190049 | Air Compressor: 50 Hp |
| Sullair | SRL-200 | 3378460001 | Air Dryer |
| | | | Air Receiving Tank |
| Delta | | | Sidekick Miter Saw |
| | | | Rolling Safety Ladder |
| | | | Pallet Jack |
| | | | Rolling Racks (Qty 3) |
| | | | Dump Hopper |
| | | | Finihing Room: |
| Graco | | | (2) Pumps & Spray Booth |
| Kremlin | | | Retson Pump |
| | | | Fan, Paint Shaker, Gun Cleaner |
| Prime | | | Heat Oven |
| Yale | EKP040BBN36SE077 | N400684 | Electric Forklift: 4000 Lb. Cap, 3-Stage Mast |
| | | | Benchtop Vertical Sander, Belt & Disc Sander |
| Rockwell | 37-220 | | 6" Jointer |
| Pro Edge | | | Miter Chopper |
| Rockwell | Unisaw | JF6393 | 10" Table Saw |
| Upright | MX19 | | Electric Platform Lift |
| SCMI | Si300N | AB/163718 | 2004  Sliding Table Saw: 10' Table Ref# 032017 |
| General | 10-105MI | 10419802 | Dust Collector |
| Rol-Lift | | | Pallet Jack |
| | | | Banding Cart |

COPYRIGHT © INDUSTRIAL RECOVERY SERVICE, INC  2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014.   All Rights Reserved.
Proposal

|  |  |  |  |
|---|---|---|---|
|  |  |  | Dump Hopper |
| Centauro | Compact 500 CO | 5720 | 18" Bandsaw |
| Crown |  |  | Walk Behind Low Height Forklift: Electric (Out of Service) |
| Yale | ERP040TFNUAE082 | A870N04398T | Electric Forklift (Out of Service) |
| Yale | ERP040TFN3CSE082 | N702783 | Electric Forklift (Out of Service) |
|  |  |  | Pallet Rack (Disassembled) |
| Delta |  |  | Unisaw |
| Evans |  |  | Postformer |
| UTM |  |  | T-Mold Machine: T-Edge Pounder |
| CTD | DM-200 | 326 | Double Miter Saw |
| Delta |  |  | Radial Arm Saw |
| CTD | CM-225 |  | Cutoff Saw |
| Delta | Unisaw |  | Table Saw |
|  |  |  | Pallet Jack |
| Pacco |  |  | Pinch Roller |
| Newman | K-16 |  | Table Saw |
|  |  |  | Pallet Jack |
| Mobel |  |  | Paint Pumps (Qty 3) |
| Jiffy |  |  | Steam Guns (Qty 30 |
| Roland | SC-540 |  | Printer |
| SCMI | R-8 |  | Router |
|  |  |  | Pallet Jacks (Qty 30 |
| Amada | Lasmac LC-2415 CXII/FS16LB-EXP | C12602469 | 1998  Laser Cutter: Fanuc Laser (Model C2000C), Fanuc Series 16-L Controller, |
|  | HCV7500-PR-NF | 12986 | Koolant Koolers |
|  |  |  | Dump Hooper |
|  |  |  | Dump Hopper |

COPYRIGHT © INDUSTRIAL RECOVERY SERVICE, INC  2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014.   All
Rights Reserved.
Proposal

| | | | |
|---|---|---|---|
| | | | Sawblades |
| | | | Pallet Jack |
| Jet | JDP-17MF | 4078929 | 17" Drill Press |
| | | | Metal Cutoff Saw |
| Starte | H200W | 135633 | Horizontal Metal Bandsaw |
| Scotchman | CPO-350LT | B93330512 | Cutoff Saw |
| Clausing 20 | 2276 | 202060129 | Drill Press |
| Delta | 70-200 | R-9116 | 17' Drill Press |
| Dake | Tiger 350 AX | | Metal Saw |
| L-Tec | PCM-Vpi | | Welder |
| | | | Torch Set w/ Cart, Torch, Regulators |
| Accupress | 7606 | 4678 | 1998  Press Brake: 60-Ton, 6' Bed |
| Accupress | 7413012 | 3103 | 1995  Press Brake: 130-Ton, 12' Bed |
| Accupress | 625010 | 2056 | 1995  Metal Shear: .25 Thickness Cap, 10' |
| Chicago | | | Finger Brake |
| Powermatic | | | 12" Disc Sander |
| | | | Double Arbor Grinder |
| Chicago | HN10 | 327149T | Notcher |
| Uni-Hydro | 42-14 | 3P3338X | Ironworker |
| Western | Arctronics | FK684 | Spot Welder: 30 Kva |
| BPR | CPH40 | 2006C015 | 2006  (3) Roll Bender |
| Miller | 252 | | Welder |
| Miller | Dynasty 200 | | Welder, Table,Curtain |
| | | | Tables |
| L-Tec | Heliarc 250 HF | | Welder |
| Miller | 252 | | Welder |
| General | | | Pneumatic Tools |
| | 252 | | Welder |

COPYRIGHT © INDUSTRIAL RECOVERY SERVICE, INC  2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014.  All
Rights Reserved.
Proposal

| Miller | | | |
|---|---|---|---|
| | | | Table, Curtain |
| Dayton | | | Grinder |
| Miller | Snycrowave 200 | | Welder |
| Miller | 252 | | Welder |
| Miller | 252 | | Welder |
| Miller | Maxstar 200 | | Welder |
| Dayton | | | Grinder |
| | | | Table |
| Thermal Arc | | | 3 in 1 Tig Welder |
| Miller | 252 | | Welder |
| | | | Table |
| | | | Misc. Throughout Building: Hand Toold, Portable Tools, Work Tables, Router Bits, Tooling |
| Ford | Econoline 250 | | Cargo Van: 294,970 Miles |
| Freightliner | Business Class M2 | VIN# 1FVACWDC64 HM51920 | 2003  Truck w/ 24' Box Body, 251,742 Miles, 26,000 GVW |
| Great Dane | 7311 | Vin# 1GRAA5612RB 117004 | 1993  Trailer w/ Lift |
| Great Dane | 701TZ-WP | VIN# 1GRAA029LS0 00709 | 1989  Reefer Trailer |
| Great Dane | 701TZ-WP | VIN# 1GRAA0027LS 000708 | 1989  Reefer Trailer |
| Great Dane | 701TZ-WP | VIN# 1GRAA0026LS 000702 | 1989  Reefer Trailer |
| Great Dane | 741T-45 | VIN#BO7659 | 1978  Trailer |
| (4) Other Trailers | | | (4) Other Trailers |
| | | | Storage Containers (Qty 2): 40' |
| | | | Pick Up in the complete plant(All small tools too numerous to mention) |
| | | | Content of office |

COPYRIGHT © INDUSTRIAL RECOVERY SERVICE, INC  2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014.   All Rights Reserved.
Proposal

### Schedule "B"
### Excluded Assets

| Manufacturer | Model | Serial # | Description |
|---|---|---|---|
| | | | 5 Cubicle Office furniture with computers |
| | | | Server room computers and equipment |
| | | | Any finished Product (What is left can be sold on commission if needed) |
| | | | Any Work in Process (What is left can be sold on commission if needed) |
| | | | Any Raw Materials (What is left can be sold on commission if needed) |

COPYRIGHT © INDUSTRIAL RECOVERY SERVICE, INC  2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014.   All
Rights Reserved.
Proposal

**Schedule B**

**Excluded Assets**

**Schedule "B"**
**Excluded Assets**

| Manufacturer | Model | Serial # | Description |
|---|---|---|---|
| | | | 5 Cubicle Office furniture with computers |
| | | | Server room computers and equipment |
| | | | Any finished Product (What is left can be sold on commission if needed) |
| | | | Any Work in Process (What is left can be sold on commission if needed) |
| | | | Any Raw Materials (What is left can be sold on commission if needed) |

COPYRIGHT © INDUSTRIAL RECOVERY SERVICE, INC  2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014.  All
Rights Reserved.
Proposal